**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

|  |  |
|---|---|
| **CHOUDHARY M. AZAM**<br>**1264 Everett Avenue**<br>**Woodbridge, Virginia 22191** | : |
| **And** | : |
| **TARIQ MAHMOOD**<br>**6245 Bren Mar Drive**<br>**Alexandria, Virginia 22312** | : |
| **And** | :   Civil Action Number: |
| **WALEED A. MOHAMMED**<br>**5505 Tranquil Court**<br>**Alexandria, Virginia 22310** | Case: 1:13-cv-01558<br>Assigned To : Huvelle, Ellen S.<br>Assign. Date : 10/9/2013<br>Description: TRO/PI |
| **And** | |
| **AHMED DJEBBOUR**<br>**2437 Menokin Drive**<br>**Apartment 204**<br>**Alexandria, Virginia 22302** | : |
| **And** | : |
| **MOHAMMED AKRAM**<br>**14050 Brook Lane**<br>**Centerville, Virginia 20121** | : |
| **v.** | : |
| **And** | : |
| **DISTRICT OF COLUMBIA**<br>**TAXICAB COMMISSION**<br>**2041 Martin Luther King Jr. Avenue, SE**<br>**Washington, D.C. 20020** | : |
| **And** | : |

**RONALD LINTON, CHAIRMAN** :
**DISTRICT OF COLUMBIA** :
**TAXICAB COMMISSION** :
**2041 Martin Luther King, Jr. Avenue, S.E.** :
**Washington, D.C. 20020** :
:
**And** :
:
**COUNCIL OF THE DISTRICT OF COLUMBIA** :
**1350 Pennsylvania Avenue, NW** :
**Washington, D.C. 200004** :
:
**And** :
:
**THE DISTRICT OF COLUMBIA** :
**A Municipal Corporation** :
**441 4th Street, NW** :
Washington, D.C. 20001 :
:
**SERVE:** :
**The Honorable Vincent C. Gray** :
**Executive Office of the Mayor** :
**1350 Pennsylvania Avenue, NW** :
**Suite 316** :
**Washington, DC 20004** :
:
**Irvin B. Nathan, Attorney General for the** :
**District of Columbia** :
**Office of the Attorney General** :
**441 4th Street, NW** :
**Suite 650** :
**Washington, DC 20004** :
:
**Defendants.** :
================================================

## VERIFIED COMPLAINT

Choudhary M. Azam, Tariq Mahmood, Waleed A. Mohammed, Ahmed Djebbour and

Mohammed Akram ("Plaintiffs"), by and through undersigned counsel, Billy L. Ponds, of The

Ponds Law Firm, respectfully submit this Complaint against the District of Columbia, the City

Council, the District of Columbia Taxicab Commission and Ronald Linton, Chairman of the District of Columbia Taxicab Commission. The plaintiffs state as follows:

## JURISDICTION

1.     Jurisdiction before this Honorable Court is invoked pursuant to 42 U.S.C. §1983, 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3). This Court also has supplemental jurisdiction of all claims pursuant to 28 U.S.C. §1367(a).

2.     The Plaintiffs bring this action to redress the deprivation of rights secured to the plaintiffs by the United States Constitution as made actionable under 42 U.S.C. §1983 and other rights secured to them by District of Columbia law.

3.     Venue is proper under 28 U.S.C. §1391(b) because all of the acts or omissions giving rise to this action occurred in the District of Columbia.

4.     On October 7, 2013, the District of Columbia was given notice of this claim pursuant to D.C. Code §12-309.

## PARTIES

5.     Plaintiff Choudhary M. Azam is a cab driver licensed to operate a taxicab in the District of Columbia.

6.     Plaintiff Tariq Mahmood is a cab driver licensed to operate a taxicab in the District of Columbia.

7.     Plaintiff Waleed A. Mohammed is a cab driver licensed to operate a taxicab in the District of Columbia.

8.     Plaintiff Ahmed Djebbour is a cab driver licensed to operate a taxicab in the District of Columbia.

9. Plaintiff Mohammed Akram is a cab driver licensed to operate a taxicab in the District of Columbia.

10. Defendant District of Columbia is a municipal corporation organized pursuant to the .aws of the United States with the authority to sue and be sued, and the local government for the territory constituting the permanent seat of the federal government of the United States.

11. At all times relevant herein, Defendant District of Columbia, among other things is responsible for the operation of the District of Columbia Taxicab Commission as an agency of the local government.

12. At all times relevant herein, Defendant District of Columbia is responsible for the policies, procedures, rules, regulations, and customs set forth and utilized for the supervision of the District of Columbia Taxicab Commission.

13. Defendant, the District of Columbia is a government entity vicariously liable for the comportment of all District of Columbia government employees, including but not limited to employees of the District of Columbia Taxicab Commission.

14. At all times relevant herein, Defendant District of Columbia among other things is responsible for the operation of the District of Columbia City Council as an agency of the local government.

15. At all times relevant herein, Defendant District of Columbia is responsible for the policies, procedures, rules, regulations, and training set forth and utilized for the supervision of the District of Columbia City Council.

16. Defendant, the District of Columbia is a government entity liable for the comportment of all District of Columbia government employees, including but not limited to members of the District of Columbia City Council.

4

17.     At all relevant times, Ronald Linton ("Linton") was the Chairman of the District of Columbia Taxicab Commission and an employee of Defendant District of Columbia and the District of Columbia Taxicab Commission.

18.     Linton is being sued in his official capacity and as an individual.

19.     At all times relevant herein, Defendant District of Columbia, among other things, is responsible for the supervision of Linton in his capacity as the Chairman of the District of Columbia Taxicab Commission as an employee of the District of Columbia government.

20.     Defendant, the District of Columbia is a government entity liable for the comportment of all District of Columbia government employees, including but not limited to Linton.

21.     Defendant District of Columbia ("District") is liable for the violations of the plaintiffs' constitutional rights and all other allegations contained in this complaint.

## FACTS

22.     On July 18, 2012, the Commission adopted the Emergency and Proposed Rulemaking, which took effect on July 25, 2012.

23.     It was later published on July 27, 2012 in the Register, at 59 DCR 8851.

24.     From August 22, 2012 to August 25, 2012 the Commission held a public hearing to receive comments on the proposed amendment to "establish a new dome light mandate" and "update penalties and fines"  .

25.     On October 2, 2012, the Emergency and Proposed Rulemaking was adopted. It was published for a second time on October 5, 2012, at 59 DCR 11594.

26.     The comment period for the Emergency and Proposed Rulemaking expired on November 3, 2012.

27.     On October 5, 2012, the Commission's Second Emergency and Proposed Rulemaking to amend 31 DCMR 600 was published.

28.     On November 14, 2012, the Commission adopted the aforementioned rulemaking as final.

29.     On May 17, 2013, the Commission's amendments to Chapter 6 were published in the Register which was adopted and became effective on the above-noted date.

30.     The amendments included adjustments to the parts and equipment for taxicab service rules consistent with the implementation of the Modern Taximeter System ("MTS").

31.     The public hearings were held on February 15 and April 17, 2013.

32.     On July 12, 2013, the Commission published its third proposed regulation pertaining to the digital payment system (DPS).

33.     On July 13, 2013, the Commission adopted A Second Notice of Emergency and Proposed Rulemaking, which was later published on July 26, 2013, at 60 DCR 11007.

34.     The final rule consists of the following components:

A new Section 604, TAXI SMART METER SYSTEM, is added to read as follows:

604.1     Effective _____, 2013, all licensed taxicabs in the District of Columbia shall be equipped with a Commission approved Taxi Smart Meter System (TSMS) that meets all of the specifications listed below: [1]

    (a)     Hardware Specifications:

    (1)     Driver Information Module (DIM):

    (A)     7" DIM:

    (i)     Configured to DCTC specifications:

    (ii)     Screen: 7" high resolution color touch screen;

    (iii)     Maximum power draw of 6W from Power Control Module;

---

[1] The new meter system was required to be installed no later than September 30, 2013

(iv)     Integrated with DCTC's Back Office Management Information System (BOMIS); and

(v)     Interface with the Dome Light

(B)     Mounting Brackets:

(i)     DIM equipment is made to accommodate all vehicle types by providing various customized mounting brackets; and

(ii)     Mounting brackets are installed on the dashboard based on the dashboard type. A universal mounting bracket can also be integrated to fit with any vehicle.

(2)     Passenger Information Module (PIM):

(A)     10" PIM:

(i)     Configured to Commission specifications;

(ii)     Screen: 10" high resolution color touch screen;

(iii)     Maximum power draw of 10W from Power Control Module; and

(iv)     Integrated with the Commission's Back Office Management Information System (BOMIS);

(B)     Mounting Brackets:

(i)     PIM equipment is made to accommodate all vehicle types by providing various customized mounting brackets; and

(ii)     Mounting brackets to install the PIM in the rear of the car, depending on the vehicle type;

(3)     Communications Device.

Wireless 3G or better CDMA Modem cellular network connection card;

(4)     GPS.

High Sensitivity GPS receiver with 48 channels of parallel tracking;

(5)     Antenna.

3dB Gain antenna mounted on the taxicab roof for maximum sky view;

(6)     Passenger Safety Button.

Integrated into PIM;

(7)     Driver Safety Button.

Integrated into DIM; and

(8)     Receipt Printer.

Integrated with the PIM.

(b)     Integration Specifications:

(1)     Authentication.

For the meter to turn on, the DIM must validate the current status (valid, revoked, or suspended) of the driver and ensure that the driver is a valid taxicab driver via real-time checks against the Commission's BOMIS.

(2)     Electronic Trip-Sheet Data Collection:

(A)     The DIM must electronically collect trip-sheet data that meets the requirements of this title. The trip-sheet reporting shall make use of Global Positioning Satellite (GPS) technologies to geospatially mark pick-up, drop-off and current taxi location information. The TSMS shall collect and record trip-sheet data according to chapter 8 of this title. All data collected through the DIM shall not be accessed or utilized by anyone on a real time basis other than the DC Unified Communications Center, law enforcement personnel or DCTC enforcement personnel as may be necessary to address an emergency initiated by the Safety Button located on the DIM or the PIM. The DCTC shall not have access to data collected through the DIM until twenty-four (24) hours after such data is collected and submitted to the DC BOMIS. The following data elements shall be captured and transmitted to the DCTC BOMIS:

(i)     The date, operator's name and identification card number (i.e., Hack License Number), taxicab company, vehicle number, and license plate number;

(ii)     The time at beginning of tour of duty;

(iii)     The time and mileage of each trip;

(iv)     The time and geospatially recorded place of origin and time and geospatially recorded place of destination of each trip;

(v)     The number of passengers and fare charged for each trip;

(vi)     The time at the end of each tour of duty;

(vii)     Trip number;

(viii)     Taxicab number;

(ix)     Itemized fare: tolls, surcharges, and tip amount for credit/debit purchases; and

(x)     Payment type (cash, credit payments, credit card brand, or debit).

(B)     The TSMS shall print all relevant fare generating trip information on the passenger taxi receipt which should print from the front of the cab after acceptance of all trip and fare information by the passenger through the PIM.  The taxi receipt shall include, at a minimum, the following trip information:

(i)     The date;

(ii)     The time and mileage of each trip;

(iii)     Trip number;

(iv)     Taxicab number;

(v)     Driver number;

(vi)     Itemized fare: tolls, surcharges, and tip amount (credit/debit only); and

(vii)     Number of passengers;

(3)     Driver Information Monitor (DIM) with Text Messaging:

(A)     The Driver Information Module (DIM) must integrate with the Commission's BOMIS and receive and send messages in text format.

(i)     The District shall be able to communicate with taxicabs in the event of an emergency; and

(ii)     The District shall be able to streamline the process for lost property claims by communicating requests to locate lost property directly to taxicab operators.

(B)     The Commission shall be able to send short alphanumeric messages from the BOMIS to taxicab DIMs and receive pre-programmed responses from drivers.

(C)     The DIM shall integrate with the Commission's BOMIS to receive and distribute directed (to individual taxicabs) and global (to all taxicabs) alphanumeric text messages. Messages can be informational (one-directional) or require drivers to respond.  Response-oriented messages shall be accompanied by corresponding "Yes / No" or custom response choices.  The DIM shall enable responses by allowing drivers to cycle through and select response choices through a single button on the DIM screen or hardware interface.  Drivers shall only be able to respond to messages when the vehicle is stationary.

(D)     The driver Safety Button must integrate with the Commission's BOMIS allowing the driver to send a distress signal to the Unified Communications Center to be passed to law enforcement officials with the current and updated location of the vehicle.

(4)     Credit/Debit Card Acceptance.

The PIM shall be enabled to accept fare payments from all major credit/debit cards, including Visa, MasterCard, American Express, and Discover cards.

(5)     Passenger Information Monitor (PIM)

(A)     The PIM is the interactive device used to complete all fare transactions. At the end of each fare, the PIM shall display the total fare (itemizing fare, tolls, and surcharges) and include an option to pay with a credit/debit card or with cash. For credit/debit card payments the PIM shall include a contact and optional contact-less reader with the ability to add a tip to the electronic payment. For cash payments, the PIM shall display the itemized charges (excluding tip) and allow the passenger to confirm and complete the cash transaction.

(B)     The PIM is the primary mechanism to supply passengers with information and content. The Commission shall be responsible for supplying programming to the PIM. The PIM shall be integrated with the Commission's BOMIS to receive programming content which may include: news, announcements, advertisements, taxicab rules and regulations, fare information, public service announcements (PSA), television and movie clips and interactive maps.

(C)     The PIM shall display the driver's name, photo, and hack license number according to Commission specifications. .

(D)     The PIM shall integrate with a Safety Button that allows the passenger to send a distress signal to the District's Unified Communications Center with the current location of the vehicle.

(E)     The PIM shall be installed in the rear passenger area of the taxicab and be easily viewable by non-visually impaired passengers and accessible to and fully functional for all passengers, including individuals with disabilities covered by Section 508 of the Rehabilitation Act of 1973, as amended (29 U.S.C. Sec. 794(d)) and Title II of the Americans with Disabilities Act (42 U.S.C. Sec. 12101 *et seq.*). The PIM and other equipment that is installed exclusively for passenger use must incorporate adaptive or assistive technology that will allow for use by all passengers, including individuals with disabilities covered by Section 508 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act. This shall include the ability for all passengers, including those with visual and physical impairments, to independently complete a credit or debit card transaction that pays for the fare. The PIM shall be simple to use; shall incorporate large keys, equipment markings, and the ability to select large font sizes; and shall provide an audible narrative of all key processing actions.

(6)     Accommodations for Future Enhancements.

Except as otherwise provided for herein, all vehicle owners are responsible for installing any future hardware or software upgrades and enhancements that are proposed to be provided by an approved TSMS vendor and approved by the Commission; provided, however, that the costs of such upgrades, including all equipment, software, and installation shall be borne by the TSMS vendor.

(7)     Use of TSMS for Dispatch Service.

(A)     No vendor providing TSMS equipment or software shall     utilize     the TSMS System to advertise or solicit the     availability of dispatch service to vehicle owners or operators without the prior written approval of the   Commission.

(B)     No vendor providing TSMS equipment or software shall     offer     a centralized dispatch service of any kind to vehicle   owners or operators at a rate that is less than that charged to     non-TSMS customers.

(C)     No vendor providing TSMS equipment or software shall     prohibit     or exclude a dispatch service from integrating its     service with the vendor's TSMS equipment and software,  nor shall such vendor assess an unreasonable fee for such   integration.

(D)     All costs for integration shall be filed with the Commission and   published by the TSMS vendor on its website.

(c)     Operational Specifications.

(1)     Installation:

(A)     The Taxi Smart Meter System shall be installed at a District of Columbia Authorized Taxi Smart Meter System Installation Business.

(B)     It is the Taxi Smart Meter System owner's technical and financial responsibility to integrate other services such as dispatch into the TSMS; provided, that no vendor providing TSMS equipment or software shall prohibit or exclude a centralized dispatch service from integrating its service with the TSMS equipment and software, nor shall such vendor assess an unreasonable fee for such integration; all costs for integration shall be filed with the Commission and published by the vendor on its website.

(C)     The Commission shall provide at no cost to the owner/operator all equipment and software for the TSMS through the equipment vendor under contract to the District of Columbia and shall pay for all costs of TSMS installations for the TSMS equipment provided by a vendor under contract to the District of Columbia for the provisions of such equipment and that is scheduled for installation through _____, 2013. The cost of all equipment and software for the TSMS obtained from an approved TSMS vendor that is not under contract to the District of Columbia, including all installation costs, are the responsibility of the owner/operator.

(D)     After _____, 2013, the taxicab owner/operator will be responsible for payment of the installation fee at the time of TSMS installation.

(E)     If a scheduled installation appointment is missed, the vehicle will be rescheduled for installation at the end of the installation process schedule, unless the vehicle owner requests and is granted an earlier date that is mutually agreeable.  If the appointment is missed due to the intentional misconduct of or willful disregard by the taxicab owner or the company, association, or fleet owner to which it is affiliated and either (i) the owner or, if relevant, the affiliated company, association, or fleet owner does not provide the Commission with written

evidence of a legitimate reason for missing the appointment, or (ii) the taxicab owner removes the taxicab from service and relinquishes to the Commission the vehicle registration and all other indicia of registration as a District of Columbia taxicab, the vehicle owner or, if relevant, the taxicab company, association, or fleet owner shall be fined a penalty of $500 per missed appointment.

        (2)    Maintenance.

Each Taxi Smart Meter System owner shall fully maintain all hardware, software, and other equipment related to the Taxi Smart Meter System. The Taxi Smart Meter System owner shall be responsible for replacing all hardware/equipment that malfunctions, is vandalized, or otherwise fails to operate. The Taxi Smart Meter System owner shall be responsible for maintaining all software including, but not limited to, upgrades and security patches and shall operate a Maintenance and Troubleshooting Operation with a single point of contact for maintenance of all Taxi Smart Meter System equipment and associated software. The Taxi Smart Meter System owner shall maintain a twenty-four (24) hour, seven (7) days a week help desk for assistance with TSMS related questions and requests for repair and shall have available on an on-call basis seven (7) days per week a facility that is capable of repairing and/or replacing all or part of a malfunctioning TSMS within eight (8) hours of receiving notification from a taxicab owner/operator of such malfunction.

        (3)    Insurance.
Each Taxi Smart Meter System owner shall offer replacement cost insurance for all hardware, software, and other equipment that is lost, stolen, destroyed, vandalized, abused, altered, or otherwise made inoperable for the purpose for which it was purchased and installed, while installed in a public vehicle for hire.

35.    Section 604.2 states:

The foregoing notwithstanding, any licensed taxicab company, association, or fleet of at least one hundred (100) vehicles that provides a central dispatch service as of July 18, 2012 and that is utilizing a Taxi Smart Meter System that substantially meets the requirements of § 604.1 may be authorized by the Commission to continue to utilize such system, provided that the system is able to provide the following:
      (a)    The system must be able to process and provide to the Commission the authorized passenger surcharge.
      (b)    The system must be able to authenticate the driver and only function when the driver possesses a currently valid license issued by the Commission.
      (c)    The system must be able to provide for cashless payment from a passenger and a receipt that is generated from the taxicab meter.
      (d)    The system must contain a safety button for both the driver and the passenger that can be activated in the event of a driver- or passenger-perceived emergency and that will provide for instant communication with the Unified Communications Center.

(e)     The system must electronically collect trip-sheet (manifest) data that meets the requirements of this chapter and that is capable of being electronically transmitted on a real-time basis to the DCTC BOMIS.

(f)     The system must be capable of receiving and distributing directed (to individual taxicabs) and global (to all taxicabs) alphanumeric text messages from DCTC through its BOMIS. Messages can be informational (one-directional) or require drivers to respond.

(g)     The system must be capable of being integrated with DCTC's BOMIS to receive programming content which may include news, announcements, advertisements, taxicab rules and regulations, fare information, public service announcements (PSA), television and movie clips, and interactive maps.

(h)     The PIM shall be installed in the rear passenger area of the taxicab and be easily viewable by non-visually impaired passengers and accessible to and fully functional for all passengers, including individuals with disabilities covered by Section 508 of the Rehabilitation Act of 1973, as amended (29 U.S.C. Sec. 794(d)) and Title II of the Americans with Disabilities Act (42 U.S.C. Sec. 12101 *et seq.*).

36.     Section 604.3 states:

Each Owner/Operator shall, upon commencement of contract performance by the TSMS vendor under contract to the District of Columbia:

(a)     Execute into a Bi-Party Agreement with the Taxi Smart Meter System vendor/business which shall set forth the rights and responsibilities of each party with regard to the installation and operation of the Taxi Smart Meter System; and

(b)     Establish a standing account with an initial deposit of one hundred dollars ($100.00) with the Taxi Smart Meter System vendor/business which shall provide for the payment to the Commission of the passenger surcharge required to be collected by each owner/operator from each payable fare pursuant to these regulations. The account will be debited for the amount of the surcharge for each cash fare that is collected by the owner/operator. A cash fare shall be any fare collected by the owner/operator that is not processed through the Taxi Smart Meter vendor/business. The owner/operator shall ensure that there is a minimum of fifty dollars ($50.00) in the account at all times. Any balance remaining in the account shall be refunded to the owner/operator when the owner/operator no longer operates a taxicab.

37.     Section 604.4 states

Until such time the TSMS vendor under contract to the District of Columbia commences performance under the contract, each owner/operator shall, if authorized by the Commission:

(a)     Establish with the Commission a standing account with an initial deposit of two hundred dollars ($200.00) for each public vehicle for hire owned by the owner, regardless of whether the vehicle is driven by an employee of the owner or rented by the owner to a licensed public vehicle for hire driver and the account shall

(1)     Provide for the payment to the Commission of the passenger surcharge required to be collected by each licensed driver from each payable fare pursuant to this title.

13

(2)     Be debited for the amount of the surcharge for each fare required to be paid by a bona fide passenger for a trip in a public vehicle for hire.

(b)     At the owner's option, have installed in each taximeter a computer chip that will allow for the wireless transmission of all meter data to another personal electronic device, so as to allow the Commission to "read" the meter and reconcile the actual paying trip data with the automatic withdrawal from the individual standing accounts.  The actual trip information shall be utilized by the Commission to reconcile the automatic withdrawals from each account.  Each account will then be credited or debited based upon the actual meter data.  If the account is further debited, the owner shall be required to add additional funds to the account so that the account contains the minimum amount set forth in this subsection.

38.     604.5 states

For purposes of this section, the Commission will assume that each owner's public vehicle for hire will record two hundred (200) fare paying trips per month and will deduct from each account the sum of one hundred dollars at the end of each month.  Each owner shall ensure that there is a minimum of one hundred dollars ($100.00) in each of the owner/operator's accounts at all times.

39.     604.6 states

For convenience, each owner may provide the Commission with a valid credit/debit card or account information from a bona fide checking/savings account from which the monthly amount shall be debited.  Each owner providing a credit/debit card number or a checking/savings account number shall be responsible for ensuring that the Commission has, at all times, a valid credit/debit card number or a valid savings/checking account number.

40.     604.7 states

Any balance remaining in an account shall be refunded to the owner/operator when the vehicle is no longer registered as a public vehicle for hire in the District of Columbia; provided, however, that an owner who replaces a licensed vehicle with another licensed vehicle may transfer the account of the old vehicle to the new vehicle.

41.     604.8 states

Before any owner/operator, including any newly licensed operator, is authorized to operate a taxicab with the Taxi Smart Meter System, the owner/operator shall complete required training on the Taxi Smart Meter System either from the Taxi Smart Meter System owner or from the Taxi Smart Meter System certified installer.

42.     604.9 states

A Taxi Smart Meter System shall only be acquired from and installed by a Taxi Smart Meter System vendor/business authorized by the Commission to provide and install the Taxi Smart Meter System.

43.     604.10 states

No taxicab shall be equipped with more than one taximeter or Taxi Smart Meter System, except where specifically approved by Commission in writing.

44.     604.11 states

At the option, and cost, of the Taxi Smart Meter System vendor, the taximeter previously installed in a taxi may be integrated into the Taxi Smart Meter System where the vendor determines that the existing meter is compatible with the Taxi Smart Meter System installation.

45.     604.12 states

If the Taxi Smart Meter System vendor determines that the existing meter in a taxi is incompatible with the Taxi Smart Meter System installation, the owner/operator must accept the replacement meter for integration into the Taxi Smart Meter System and the owner/operator shall retain possession of his or her original meter.

46.     604.13 states

Each Taxi Smart Meter System shall be tested once per year by a Taxi Smart Meter System business licensed by the Commission. The annual inspection shall be identical to the inspection process identified in § 1324.1 of this Title.

47.     604.14 states

Each new Taxi Smart Meter System unit submitted for approval to the Commission by the manufacturer, its licensed representative, or the taximeter business shall be subject to a testing period.

48.     604.15 Drivers shall comply with the following requirements:

(a)     A taxicab shall not be considered "For Hire" unless the Taxi Smart Meter System is in good working condition;

(b)     A driver shall not pick up or transport a passenger unless the Taxi Smart Meter System is capable of printing fare receipts for passengers; and

(c)     A driver while on duty shall not operate a taxicab unless the LED portion of the dome light displays "Taxi For Hire" when the Taxi Smart Meter System is not in use and the driver

is available to transport a passenger, and the LED portion of the Dome Light displaying "Taxi For Hire" is "Dark" when the Taxi Smart Meter System is in use transporting a passenger.

49.   604.16 states

Tampering with the taximeter, Taxi Smart Meter System, or dome light is prohibited.

(a)   A driver shall not operate a taxicab in which the Taxi Smart Meter System has been tampered with, broken, or altered in any manner. The operation of a taxicab with a broken Taxi Smart Meter System shall give rise to a rebuttable presumption that the driver knew of the tampering or alteration and operated the taxicab with such knowledge.

(b)   A driver shall not tamper with, repair or attempt to repair, or connect any unauthorized device to the Taxi Smart Meter System, cable connection, or electrical wiring thereof, or make any change in the vehicle's mechanism or its tires which would affect the operation of the Taxi Smart Meter System. Notwithstanding the foregoing, a driver may utilize a device that allows for digital dispatch from an authorized dispatch service.

(c)   A driver shall not tamper with the dome light or any of the interior lights or connections except to replace a defective bulb or fuse. The dome light of a taxicab shall be automatically controlled by the operation of the Taxi Smart Meter System so that the LED portion of the dome light displays "Taxi For Hire" when the Taxi Smart Meter System is not in use and available to pick up passengers, and the LED portion of the dome light shall go "dark" when the Taxi Smart Meter System is in use transporting a passenger. The operation of a taxicab with an unauthorized dome light shall give rise to a rebuttable presumption that the driver knew of the unauthorized dome light and operated the taxicab with such knowledge.

(d)   A taxicab driver/owner/operator shall not place tires or wheels of a different size, or "off-size" tires, on the taxicab without reinspection and recalibration of the Taxi Smart Meter System. A taxicab driver, owner, or operator shall not operate a taxicab with tires inflated outside the manufacturer's recommended level, whether "under" or "over inflated".

(d)   Except as is otherwise the responsibility of the Taxi Smart Meter System owner, vendor, or manufacturer, a taxicab owner/operator shall be held responsible for replacement or replacement cost for Taxi Smart Meter System equipment which is lost, stolen, destroyed, abused, altered, or otherwise made inoperable for the purpose for which it was purchased and installed, while in the owner/operator's possession. The owner/operator must replace, at its expense, the Taxi Smart Meter System and shall be suspended from operating until the Taxi Smart Meter System is fully operational.

50.   604.17

The Taxi Smart Meter System must be immediately surrendered to the authorized Taxi Smart Meter System installer when the vehicle is removed from service as a licensed taxi in the District of Columbia, whether the removal is voluntary or involuntary. However, if the vehicle being removed from service as a licensed taxicab is being immediately replaced with a new vehicle

by the vehicle owner, the vehicle owner is authorized to have an authorized Taxi Smart Meter System installer reinstall the System in the replacement vehicle; provided, however, that such vehicle owner immediately notifies the Commission of such action on a form provided by the Commission.

51.    604.18

The Taxi Smart Meter System installer must immediately notify the Commission in writing when a Taxi Smart Meter System is surrendered to the authorized Taxi Smart Meter System installer when the vehicle is removed from service as a licensed taxi in the District of Columbia, whether the removal is voluntary or involuntary.

52.    604.19 states:

Effective _____, 2013, any licensed taxicab in the District of Columbia that has not been equipped with a Commission approved Taxi Smart Meter System is not authorized to be operated as a licensed public vehicle for hire in the District of Columbia and will be ticketed and towed off of the public streets as an unlicensed vehicle.

53.    604.20 states

Effective _____, 2013, any taxi vehicle added to the taxi fleet in the District of Columbia shall be equipped with a Commission approved Taxi Smart Meter System that meets the specifications listed in § 604.1. Further, effective _____, 2013, the costs of the TSMS, including installation of the meter and TSMS, shall be the responsibility of each owner/operator.

54.    604.2116 states

Effective _____, 2013, all costs to install, transfer, or replace (except where covered under vendor warranty or insurance or under the District's contract with a TSMS vendor) Taxi Smart Meter System equipment will be the financial responsibility of the owner/operator.

55.    Section 605, CRUISING LIGHTS, is amended as follows:

**605     DOME LIGHTS AND TAXI NUMBERING SYSTEM**

**Subsections 605.1 through 605.10 are amended to read as follows:**

605.1 Effective _____, 2013, all licensed taxicabs in the District of Columbia shall be equipped with the Commission-approved Dome Lights and Taxi Number System that meets the specifications listed below:[2]

---

[2] The dome light must be installed no later than November 1, 2013.

(a)     The Dome Light shall display the public vehicle identification number ("PVIN") assigned by the Commission on the left side of the Dome Light when viewed from the front and the right side of the Dome Light when viewed from the rear of the dome light;

(b)     The Dome Light shall be connected to the engine and that portion of the Dome Light that displays the PVIN shall remain on at all times when the car's engine in on; provided, however, that the Dome Light may contain a driver activated switch located on the side of the Dome Light that will allow the complete Dome Light to remain dark when the vehicle is either off-duty or is being utilized for personal use;

(c)     Roof Light Housing shall be aluminum or silver colored acrylic: H – 8.0" x D– 6" sloping to 87" x W 48"; Thickness – 1";

(d)     The left part of the Dome Light shall be H - 8" x W- 12", silver in color with the PVIN etched in white plastic acrylic letters that are H-5" and housing a bulb to illuminate the PVIN;

(e)     The right portion of the Dome Light shall be H- 8" x  W – 36", silver in color with a clear acrylic cover that shall contain a single line LED programmable moving display that scrolls "TAXI FOR HIRE" in characters that are H-4";

(f)     The base shall be constructed of aluminum with a continuous neoprene base that surrounds the entire base with several rubber gaskets to allow for drainage of water and condensation.

(g) A visual depiction of the dome light is shown below:

56.     605.2   states

The required dome light shall only be installed by Dome Light Installation businesses authorized by the Commission to install the approved dome light.

57.     605.3 states

The Dome Light shall be fully visible to a person of average height at all times when the vehicle is cruising.  Vehicles of greater length or height shall be required to have two (2) fully functioning dome lights.  Vehicles that contain advertising signs on the roof shall have a fully functioning dome light on the front and rear of the advertising sign.

58.     605.3 states

Each new Dome Light will identify the newly assigned taxicab vehicle identification number assigned by the Commission to that specific taxicab vehicle.

59.     605.4 states

The PVIN does not replace a taxicab company's, association's, or fleet's taxicab fleet numbering system provided in § 503.10 of this title. However, the PVIN on the Dome Light will replace the current vehicle identification numbers assigned to independently operated taxicabs pursuant to § 505.7 of this title.

60.     605.5 states

The LED portion of the Dome Light shall display "Taxi For Hire" at all times when the taxicab is available for hire and the LED portion of the Dome Light shall go "dark" when the taxicab is not available for hire because the taxicab is carrying a passenger, is on call, or is off duty not intending to take on passengers. The Dome Light may contain a driver activated switch on the side of the Dome Light that will allow the complete Dome Light to remain dark when the vehicle is either off-duty or is being utilized for personal use

61.     605.6 states

Whenever a taxicab operator removes his or her vehicle from service and is proceeding to a place of his or her choosing without intending to take on passengers, the "Taxi For Hire" light shall go "dark."

62.     605.7 states

Whenever a taxicab is responding to a dispatch call or proceeding to a prior arranged transport, the "Taxi For Hire" light shall go "dark."

63.     605.8 states

No taxicab shall be operated unless its Dome Light is in proper working condition. The operation of a taxicab with a broken Dome Light shall give rise to a rebuttable presumption that the driver knew of the condition and operated the taxicab with such knowledge.

**(Class Action Allegations)**

64.     Plaintiffs seek to certify a class of persons who are currently licensed to operate a taxicab in the District of Columbia.

65.     Plaintiffs seek to certify a class of all persons under Rule 23(b)(3), of the Federal Rules of Civil Procedure.

66.     Plaintiffs state that the class is too numerous to be joined individually-as the potential class is well over two thousand (2000) persons. There are issues of fact and law common

to all class members. The claims of the plaintiffs are typical of claims of the members of the proposed class. Plaintiffs can adequately represent the interests of the class.

**COUNT I**

**Violation of Title II Of The Americans With Disabilities Act Pursuant To 42 U.S.C. §1983 (Against the District of Columbia Taxicab Commission and the District of Columbia City Council)**

67.     The Plaintiffs incorporate by reference paragraphs 1 through 66 as if fully set forth herein.

68.     At all relevant times, the Commission and the City Council were state actors acting under the color of law, custom or usage of the District and on behalf of, and in the interests of their employer, the District.

69.     Effective November 3, 2013, the District of Columbia Taxicab Commission requires all District of Columbia taxicabs to replace their current dome lights on the roof of the taxicabs with the new dome light system.

70.     The current dome light system has a flashing "call 911" sign on the end of the dome light.

71.     This 911 call sign enables the taxicab driver to activate the call 911 sign from the inside of the taxicab.

72.     This activation triggers a flashing light that illuminates "call 911" on both ends of the horizontal or middle portion of the dome light.

73.     The call 911 sign alerts pedestrians, other drivers and law enforcement officials that a taxicab driver's life is in distress due to a medical crisis or physical harm by a third party.

74.     As a result of this alert, pedestrians and other drivers can alert law enforcement officials that a cab driver is in distress.

75.    With the absence of the "call 911" signal, the new dome light system mandated by the Commission does not contain the 911 flashing sign on the dome light located on the roof of the taxicab.

76.    The new dome light system creates a hazardous condition for all of the taxicab drivers and passengers, particularly taxicab drivers with a disability.

77.    If a taxicab driver with a disability encounters a medical crisis or is a victim of a crime, the absence of call 911 sign places the taxicab driver and any passenger in danger.

78.    The lower cost dome light system, unlike the present system, excludes a switch inside of the cab used to indicate whether the taxicab driver is on call or off call.

79.    In order to activate the new dome light on call or off call indicator, the taxicab driver must physically exit the vehicle to activate the system from a device located on the dome light on the roof of the vehicle.

80.    The taxicab drivers who install the new lower cost dome light must perform the aforementioned measures regardless of traffic conditions, weather conditions, or the conditions of the area of town where the driver is located when he or she must exit there vehicle.

81.    A taxicab driver with a disability has no other option but to purchase the more expensive dome light in order to accommodate their disability.

82.    The new dome light requirement presents a cost prohibitive imposition upon the taxicab drivers with a disability and presents an employment obstacle because of the higher cost of the proper equipment to accommodate their disability.

83.    The new dome light requirement strips away all of the protections and benefits set forth pursuant to the Americans With Disabilities Act.

84.    This impediment did not exist under the prior dome light system.

85.     This disparity arises solely as a result of the new dome light mandated by the Commission.

86.     This disparity and financial burden is in direct contradiction to the provisions set forth in the Americans With Disabilities Act, §35.140.

87.     The new dome light requirement was implemented with reckless disregard for the safety and welfare of those cab drivers with disabilities and all taxicab passengers.

## COUNT II
**Violation of Plaintiffs' Fourth Amendment Rights Pursuant to 42 U.S.C. §1983**
**(Against the District of Columbia Taxicab Commission and the District of Columbia City Council)**

88.     The Plaintiffs incorporate by reference paragraphs 1 through 87 as if fully set forth herein.

89.     The plaintiffs have a constitutional right pursuant to the Fourth Amendment of the United States Constitution to be secure from state actions that would result in unlawful searches, seizures, and arrests without probable cause.

90.     At all relevant times, the Commission were state actors under the color of law, custom or usage of the District of Columbia, and on behalf of, and in the interests of their employer, the District.

91.     The MTS smart chip contains a GPS tracking system that tracks the movement of the taxicab driver as well as the passenger.

92.     The MTS smart chip tracks all trips from arrival to the final destination.

93.     The MTS smart chip reveals the identity of the passenger who traveled in the taxicab and paid for the fare by a credit or debit card as well as the time and location where the travel was initiated and the disembarkation point.

94.     All the information after a credit card transaction is processed is downloaded in real time to the District of Columbia Taxicab Commission.

95.     This GPS tracking is an invasion of privacy for the driver and the passenger and is a violation of the Fourth Amendment to the United States Constitution.

96.     The implementation of the MTS by the Commission as approved by the City Council, the defendants have violated the plaintiffs Fourth Amendment constitutional rights.

## COUNT III
### Violation Of The Equal Protection Clause
**(Against the District of Columbia Taxicab Commission and the District of Columbia City Council)**

97.     The Plaintiffs incorporate by reference paragraphs 1 through 96 as if fully set forth herein.

98.     The plaintiff and other members of the class are literally all foreign born or are African-Americans.

99.     With the installation of the MTS which includes GPS tracking, the Commission tracks the movement of the taxicab driver.

100.    Under the Modern Taximeters Systems Regulations ("MTS"), the plaintiffs and the class member are required to establish an account with an approved payment service provider ("PSP") for the credit card transactions.

101.    The Commission has the full authority to mine all information from every taxicab drivers' transaction.

102.    The Commission is privy to all of the taxicab drivers' activities.

103.    With the installation of the MTS, the plaintiffs and the class members are obligated to pay to the Commission twenty five cents ($.25) for every cash or credit card fare.

104.    If the taxicab driver does not remit the required payment to the Commission within a requisite period of time, the Commission will unilaterally access the taxicab driver's vendor-established and mandated account and deduct the amount due to this agency for the cash transactions from the account maintained for the credit card transactions.

105.    If a taxicab driver does not have sufficient funds in his PSP account, the Commission will remotely automatically turn off the taxicab driver's meter and the driver is precluded from picking up any passengers.

106.    The twenty five cent ($.25) tax ("Tax") that the plaintiffs and the class members are required to pay to the Commission diminishes their income.

107.    The Commission's ability to automatically withdraw funds from a taxicab drivers' PSP account provides the Commission with unfettered access to each taxicab driver's credit card transactions with a passenger.

108.    The MTS and the New Standardized Dome Light regulations as to the collection of the twenty five cent ($.25) tax and financial information is inconsistent as to the collection of surcharges, sales tax, or any other tax for other similarly situated persons or businesses.

109.    There are neither any privately nor publicly traded businesses in the District of Columbia that are subjected to this automatic deduction and immediate withdrawal of payment to a District of Columbia agency for any surcharge, sales or any other tax after each financial transaction is conducted with a customer.

110.    Only taxicab drivers are subjected to these draconian measures.

111.    There is neither any privately-owned nor publicly traded business in the District of Columbia where each financial transaction is downloaded to a District of Columbia agency.

112.    These regulations imposed upon the plaintiffs and similar class members creates power and authority to the District of Columbia Taxicab Commission that does not even exist with the Internal Revenue Service.

113.    The plaintiffs and similar members are a suspect class and this automatic deduction and real time transfer of each financial transaction violates the Equal Protection Clause pursuant to the Fifth Amendment.

## COUNT IV
### Violation Of The Age Discrimination And Employment Act By The District and the Commission

114.    The Plaintiffs incorporate by reference paragraphs 1 through 113 as if fully set forth herein.

115.    Plaintiff Choudhary M. Azam and similar class members are over the age of forty.

116.    Plaintiff Waleed A. Mohammed and similar class members are over the age of forty.

117.    Plaintiff Mohammed Akram and similar class members are over the age of forty.

118.    Plaintiff Ahmed Djebbour and similar class members are over the age of forty.

119.    Plaintiff Tariq Mahmood and similar class members are over the age of forty.

120.    Plaintiff Choudhary M. Azam and similar class members have been subjected to discrimination by the District and the Commission as a result of the enactment of the New Standardized Dome Light Regulations.

121.    Plaintiff Waleed A. Mohammed and similar class members have been subjected to discrimination by the District and the Commission as a result of the enactment of the New Standardized Dome Light Regulations.

122.    Plaintiff Mohammed Akram and similar class members have been subjected to discrimination by the District and the Commission as a result of the enactment of the New Standardized Dome Light Regulations.

123.    Plaintiff Ahmed Djebbour and similar class members have been subjected to discrimination by the District and the Commission as a result of the enactment of the New Standardized Dome Light Regulations.

124.    The current dome light system does not violate the Age Discrimination and Employment Act ("AEDA").

125.    The current dome light system provides for an equal playing field for all taxicab drivers.

126.    The New Standardized Dome Light Regulations places an undue burden on taxicab drivers over the age of forty and puts them at an unfair disadvantage to drivers who are younger than forty.

127.    The New Standardized Dome Light Regulations violates the AEDA based on age discrimination.

**COUNT V**
**Violation of Plaintiffs Fourth and Fifth Amendment Rights Pursuant To 42 U.S.C. §1983**
**(Against Ronald Linton)**

128.    Plaintiff incorporates by reference paragraphs 1 through 127 as if fully set forth herein.

129.    At all relevant times, Ronald Linton, Chairman, of the District Taxicab Commission was a state actor acting under the color of law, custom or usage of the District of Columbia Taxicab Commission, and on behalf of and in the interests of his employer, the District, as set forth in Counts I, II, III and IV of this Complaint.

130.    Linton, in his capacity as Chairman of the Commission, is liable for supervising the conduct of commission members in relation to constitutional and other violations as set forth in Counts I, II, III and IV of this Complaint that the defendants committed against the plaintiffs and other class members.

131.    Linton failed in his fiduciary duty to his employer, the District of Columbia, to bring to their attention any conduct involving constitutional violations by the District of Columbia Taxicab Commission.

132.    Linton is individually liable for the conduct set forth in Counts I, II, III of this Complaint.

## COUNT VI
### Negligence In Hiring, Training, Supervision and Retention
### (Against the District of Columbia)

133.    Plaintiff incorporates by reference paragraphs 1 through 132 as if fully set forth herein.

134.    Defendant District had a duty to properly hire, train, supervise and terminate, if necessary, its personnel in order to protect the public against constitutional violations which would be likely to occur in absence of proper hiring, training, supervision, and firing.

135.    The District controls the personnel it employs regarding the conduct and actions of the District of Columbia Taxicab Commission.

136.    The District of Columbia has a duty to properly supervise and control the unlawful actions and conduct of the District of Columbia Taxicab Commission and its agents.

137.    The District of Columbia has failed to effectively train, supervise discipline, and control the personnel it employs as agents of the District of Columbia Taxicab Commission regarding the appropriate, non-discriminatory treatment of citizens of the District of Columbia.

138.    The District of Columbia has failed to effectively train, supervise discipline, and control the personnel it employs in the District of Columbia Taxicab Commission regarding the need for probable cause for invasion of privacy and violations of the Fourth and Fifth Amendments and the Americans with Disabilities Act.

139.    Defendant District of Columbia violated its duty to properly hire, train, supervise, and suspend and terminate agents of the District of Columbia Taxicab Commission.

## COUNT VII
### Violation of Plaintiffs Fourth and Fifth Amendment Rights Pursuant To 42 U.S.C. §1983 (Against The District of Columbia)

140.    Plaintiff incorporates by reference paragraphs 1 through 139 as if fully set forth herein.

141.    At all relevant times, the District of Columbia Taxicab Commission and the City Council were state actors acting under the color of law, custom or usage of the District of Columbia Taxicab Commission, and on behalf of and in the interests of their employer, the District of Columbia as set forth in Counts I, II, III, IV, V and VI of this Complaint.

142.    The District of Columbia is liable for the conduct of its agents in relation to the constitutional and other violations as set forth in Count I, II, III, IV, V and VI of this Complaint that the defendants committed against the plaintiff and other class members.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs:

I.    Re-pleads and re-alleges counts 1 through 142 with the same force and effect as if fully set forth herein;

II.    Requests, subject to further discovery, the right to amend the complaint, and that the Court:

III.    Permanently enjoin the defendants from enforcing the Modern Taximeters Systems Regulations and the New Standardized Dome Light Regulations;

28

IV.    Award damages to all of the plaintiffs and similar class members who have incurred costs for the installation of the new taximeters and dome lights;

V.    Award attorney's fees and court costs to plaintiffs; and

VI.    Award such other relief as this Honorable Court deems just and fair.

_____
Choudhary M. Azam

_____
Tariq Mahmood

_____
Waleed A. Mohammed

_____
Ahmed Djebbour

_____
Mohammed Akram

By Counsel


Respectfully submitted,

_____
Billy L. Ponds
Counsel for the Plaintiffs
The Ponds Law Firm
Bar Number 379883
1250 24th Street, N.W.
Suite 300
Washington, D.C. 2007
Telephone Number: (202) 333-2922
Facsimile Number: (202) 333-4114
E-Mail: plfpc@aol.com

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **CHOUDHARY M. AZAM, et.al.** | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v.** | : |
| | : |
| **THE DISTRICT OF COLUMBIA, et. al.** | : |
| | : |
| **Defendants.** | : |

=====================================

## JURY DEMAND

Plaintiff hereby requests a trial by jury of six (6) on all facts, triable issues and counts in this Amended Complaint including the amount of damages to be awarded.

> Choudary M. Azam
> Tariq Mahmood
> Waleed A. Mohammed
> Ahmed Djebbour
> Mohammed Akram
> By Counsel
>
> Respectfully submitted,
>
> Billy E. Ponds
> Counsel for the Plaintiffs
> The Ponds Law Firm
> Bar Number 379883
> 1250 24th Street, N.W.
> Suite 300
> Washington, D.C. 2007
> Telephone Number: (202) 333-2922
> Facsimile Number: (202) 333-4114
> E-Mail: plfpc@aol.com