UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| CHOUDHARY M. AZAM, *et al.*, | ) ) ) |
| **Plaintiffs,** | ) ) ) |
| v. | ) ) Civil Action No. 13-1558 (ESH) |
| DISTRICT OF COLUMBIA TAXICAB COMMISSION, *et al.*, | ) ) ) ) |
| **Defendants.** | ) ) ) |

## MEMORANDUM OPINION

Plaintiffs, individuals who are either licensed to operate taxicabs in the District of Columbia or who utilize taxicabs as passengers, bring this action against Ronald Linton, Chairman of the District of Columbia Taxicab Commission, and the District of Columbia, challenging various regulations enacted by the Commission as violating the Fourth and Fifth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Age Discrimination in Employment Act ("ADEA"). (*See* 2d Am. Compl., Nov. 23, 2014 [ECF No. 17] ("2AC").) Before the Court are plaintiffs' motion for a preliminary injunction (Pls.' Mot. for Preliminary Injunction, Nov. 23, 2013 [ECF No. 18] ("PI Mot.")) and defendants' motion to dismiss or, in the alternative, for summary judgment. (Defs.' Mot. to Dismiss Pls.' Second Am. Compl. or, in the Alternative, for Summary Judgment, Jan. 17, 2014 [ECF No. 19] ("Defs.' MTD/SJ Mot.").) For the reasons stated herein, defendants' motion to dismiss will be granted. Plaintiffs' motion for a preliminary injunction and defendants' motion for summary judgment will be denied as moot.

**BACKGROUND**

In 2012, the D.C. Council enacted the Taxicab Service Improvement Amendment Act of 2012 ("Improvement Act"). 2012 District of Columbia Laws 19-184 (Act 19-437). One section of the Improvement Act addressed the "modernization of taxicabs" in the District, giving the District of Columbia Taxicab Commission[1] "one year from October 22, 2012, to modernize the taxicab fleet and make vehicle and equipment improvements, including installation of meter systems that would accept non-cash payment of fares and electronically collect trip-sheet data through the use of GPS technology" and installation of "[u]niform cruising lights that clearly display a taxicab's identification number, as well as identify when a taxicab is occupied, on-call, off-duty, or available to accept a fare." *See* D.C. Code § 50-326(1)-(2). The Act further authorized the Taxicab Commission to collect a "passenger surcharge" for each ride "in an amount not to exceed 50 cents" to help fund the Commission. D.C. Code §§ 50-303, 50-320

Pursuant to the Improvement Act, the Taxicab Commission issued implementing regulations, which, in relevant part, provide for the collection of a $0.25 passenger surcharge for each trip, 31 D.C. Mun. Regs. § 1103; require licensed taxicab drivers to install a "modern taximeter system" ("MTS"); *see* 31 D.C. Mun. Regs. § 603 ("MTS Regulation"), and require drivers to install a new standardized dome light, 31 D.C. Mun. Regs. § 605 ("Dome Light

---

[1] The District of Columbia Taxicab Commission was "established . . . as a subordinate agency of the executive branch of the District government with exclusive authority for intrastate regulation of the public vehicle-for-hire industry." D.C. Code § 50-304; *see also* D.C. Code § 50-307(a) ("The Commission is charged with the continuance, further development, and improvement of the public vehicle-for-hire industry within the District, and for the overall regulation of limousines, sedans, taxicabs, taxicab companies, taxicab fleets, and taxicab associations.").

Regulation").[2] The aspects of the MTS Regulation and Dome Light Regulation that are at issue in the present litigation are summarized below.

*MTS Regulation*

The MTS Regulation requires drivers to acquire an MTS from an approved "payment service provider" ("PSP"). The MTS includes a taximeter, a global positioning system, and a payment processing unit. The MTS is turned on when a driver begins a shift and turned off when the shift ends. When it is on, the MTS connects to the PSP, which then receives and processes payment information for each trip in real time. Through the PSP, the MTS is also connected to the Taxicab Commission's Taxicab Information System ("TCIS").[3] Every 24 hours, the MTS transmits data to the TCIS, including:

(1) The date;

(2) The operator identification (Face Card) number and PVIN, reported in a unique and anonymous manner allowing the PSP to maintain a retrievable record of the operator and vehicle;

(3) The name of the taxicab company, association, or fleet if applicable;

(4) The PSP-assigned tour ID number and time at beginning of tour of duty;

(5) The time and mileage of each trip;

(6) The time of pickup and drop-off of each trip;

(7) The geospatially-recorded place of pickup and drop-off of each trip which may be generalized to census tract level;

(8) The number of passengers;

---

[2] The Court notes that the complaint includes the text of earlier versions of the relevant regulations. (*See* 2AC ¶¶ 38-67.)

[3] When the driver turns on the taximeter and logs in, the MTS validates the driver's identity and license status. *See* 31 D.C. Mun. Regs. § 603.9(a).

(9) The unique trip number assigned by the PSP;

(10) The taximeter fare and an itemization of the rates and charges pursuant to § 801;

(11) The form of payment (cash payment, cashless payment, voucher, or digital payment), and, if a digital payment, the name of the DDS;

(12) The time at the end of each tour of duty.

31 D.C. Mun. Regs. § 603.9(c). The MTS is also used to "provide the information necessary to ensure that the passenger surcharge has been assessed for each trip, regardless of how the fare is paid." *Id*. § 603.9(d). Every seven days, the PSP must remit the passenger surcharges it collects to the District. *Id*. § 408.15.

*Dome Light Regulation*

The Dome Light Regulation requires drivers to install new "uniform" dome lights. These dome lights differ from prior lights in two material ways. First, instead of being operated by a manual switch, the dome light display is controlled by engaging the MTS. The dome light displays "'Taxi For Hire' at all times when the taxicab is available for hire" and goes "'dark' when the taxicab is not available for hire because the taxicab is carrying a passenger, is on call, or is off duty not intending to take on passengers." 31 D.C. Mun. Regs. §§ 605.5, 605.6, 605.7. The "Taxi For Hire" display cannot be manually changed from inside the cab to read "Taxi On Call", unless the driver is affiliated with an "authorized dispatch company." (2AC ¶¶ 82-86); 31 D.C. Mun. Regs. § 602. Second, the new dome light eliminates the "Call 911" display option, which drivers formerly could activate via a manual switch inside the taxicab in the case of an emergency to alert passersby that assistance was needed. (2AC ¶¶ 74-79.)

Six individuals who are licensed to operate taxicabs in the District of Columbia (Choudhary M. Azam, Tariq Mahmood, Waleed A. Mohammed, Ahmed Djebbour, Mohammed

4

Akram, and Mohammed Saleem Syed) and two individuals who utilize District of Columbia taxicabs as passengers (Benjamin P. Stewart and Per Kristian Hoel) have filed a complaint against the District of Columbia alleging that the MTS Regulation violates the Fourth Amendment's protection against "unreasonable searches and seizures" and the Fifth Amendment's guarantee of equal protection and that the Dome Light Regulation violates the Title II of the ADA and the ADEA (Counts I-IV). The complaint also seeks to hold Linton individually liable for these violations (Counts V-VII) and to hold the District liable for negligence in failing to prevent the violations (Count VIII). Plaintiffs seek a preliminary injunction. In response, defendants have opposed plaintiffs' motion and have moved to dismiss the complaint for lack of standing[4] and failure to state a claim, *see* Fed. R. Civ. P. 12(b)(1), (6), or, in the alternative, for summary judgment. *See* Fed. R. Civ. P. 56.

## ANALYSIS

### I. STATUTORY CLAIMS AGAINST THE DISTRICT

#### A. ADA (Count I)

Count I of plaintiffs' complaint alleges that the Dome Light Regulation violates Title II of the ADA. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132[5]; *see also* 28 C.F.R. § 35.130.[6] According to plaintiffs, the Dome Light

---

[4] In this Circuit, a motion to dismiss for lack of standing constitutes a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("the defect of standing is a defect in subject matter jurisdiction").

[5] A person has a "disability" if he has "(1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) is regarded as

Regulation discriminates against taxi drivers with disabilities by (1) only allowing drivers affiliated with an approved dispatch company to have an in-car switch that changes the display from "Taxi For Hire" to "Taxi On Call"; and (2) eliminating the option to have "Call 911" displayed on the dome light. (2AC ¶¶ 14-15.) The complaint alleges that these changes "create[] a hazardous condition for all of the taxicab drivers and passengers, particularly taxicab drivers with a disability," and that they were "implemented with reckless disregard for the safety and welfare of those cab drivers with disabilities." (2AC ¶¶ 80, 91.) Defendants have moved to dismiss for lack of standing and failure to state a claim.

### 1. Standing

Defendants' contention that plaintiffs lack standing to challenge the Dome Light Regulation as violating the ADA is without merit. "To establish constitutional standing, a plaintiff must show an injury in fact that is fairly traceable to the challenged conduct and that will likely be redressed by a favorable decision on the merits." *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–

---

having such an impairment." *Id*. § 12102(1). The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C.A. § 12131.

[6] 28 C.F.R. § 35.130 states:

> A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability.

61 (1992)).[7]  "When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must [alleged] . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue.  If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62.  "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S. Ct. 1942, 1952, 20 L. Ed. 2d 947 (1968) Thus, "[i]n 'reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.'" *Muir*, 529 F.3d at 1105 (quoting *City of Waukesha v. EPA,* 320 F.3d 228, 235 (D.C. Cir. 2003)); *see Warth v. Seldin,* 422 U.S. 490, 501 (1975); *see also Louisiana Energy & Power Authority v. FERC,* 141 F.3d 364, 367–68 (D.C. Cir. 1998) (whether a statute has been violated "is a question that goes to the *merits* . . . and not to constitutional standing," because a "party need not *prove* that the . . . action it attacks is unlawful . . . in order to have standing to level that attack").

Here, the complaint alleges injury (that "[t]he new dome light system creates a hazardous condition" for Syed and other drivers with disabilities), causation (the Dome Light Regulation is the reason all drivers have to install the new dome light system), and redressability (if the Dome

---

[7] An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560-61 (internal citations and quotations omitted).  The "fairly traceable" element for constitutional standing requires "a causal connection between the injury and the conduct complained of." *Id.* at 560-61 (internal citations and quotations omitted).  Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal citations and quotations omitted).

Light Regulation violates the ADA, disabled drivers could not be required to install the new system). These arguably bare bones allegations "are sufficient, at this pre-discovery stage, to meet the requirements of constitutional standing. *Muir*, 529 F. 3d at 1105.

### 2. Failure to State a Claim

Although the ADA count will not be dismissed for lack of standing, it will be dismissed for failure to state a claim. To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Iqbal*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.,* at 556. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. Nor will a complaint survive if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id*., at 557.

To state a claim under Title II of the ADA, a plaintiff must allege: (1) that he is a "qualified individual with a disability"; (2) who "was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity"; and (3) that "such exclusion, denial of benefits, or discrimination was by reason of his disability." *Alston v. D.C*., 561 F. Supp. 2d 29, 37 (D.D.C. 2008). The complaint alleges that plaintiff Syed has a "certified medical disability as a result of a brain hemorrhage and stroke he suffered"[8] and that the new Dome Light system creates a

---

[8] The complaint also alleges that "The Social Security Administration has certified Plaintiff Mohammed Saleem Syed as disabled effective November 1, 2005" and that he "receives supplemental security income payments from the Social Security Administration as a result of his certified disability." (2AC ¶¶ 14, 15, 16.)

"hazardous condition" for him and other drivers with disabilities. (2AC ¶¶ []-[].) What the complaint fails to plausibly allege is that the Dome Light Regulation imposes a greater burden on Syed, or on any other driver with a disability, than it imposes on drivers without disabilities. For example, the complaint alleges that "[a]bsent the interior switch, those taxicab drivers who are not affiliated with a dispatch system can only activate or deactivate the "TAXI ON CALL" by physically exiting the vehicle and activate the switch on the exterior of the new dome light on the roof of the vehicle," and that "[t]his must be done regardless of traffic conditions, weather conditions, or the conditions of the area of town where the driver is located when he or she must get out of his/her car," but fails to allege why this burden would be any greater for plaintiff Syed, or any driver with a disability, than it is for drivers without disabilities. Similarly, the complaint alleges the lack of a Call 911 display option creates a hazardous condition because "[i]f a taxicab driver with a disability . . . encounters a medical crisis or is a victim of a crime, the absence of call 911 sign places the taxicab driver . . . and any passenger in danger," but again the complaint does not allege any facts to suggest that this hazard would be greater for Syed and other drivers with disabilities than for drivers without disabilities. Without knowing the nature of Syed's or any other driver's disability, there is no factual basis for the conclusory allegation that the Dome Light Regulation is "particularly" hazardous for drivers with disabilities, and the complaint has not plausibly alleged that Syed has been discriminated against "by reason of his disability."

    **B.**    **ADEA (Count IV)**

Count IV of the complaint alleges that the Dome Light Regulation violates the Age Discrimination in Employment Act ("ADEA"). Under the ADEA, it is "unlawful for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.A. §

623(a)(1). The complaint alleges that the Dome Light Regulation "places an undue burden on taxicab drivers over the age of forty and puts them at an unfair disadvantage to drivers who are younger than forty." (2AC ¶¶ 121-134.) The complaint further alleges that this burden amounts to discrimination in violation of the ADEA. Five of the named plaintiffs (Azam, Mohammed, Akram, Djebbour, and Mahmood) are licensed taxi drivers who "are over the age of forty." Defendants have moved to dismiss each count for lack of standing and failure to state a claim.

### 1. Standing

The District's challenge to plaintiffs' standing is again without merit. Plaintiffs allege that the Dome Light Regulation puts drivers over the age of forty at an unfair disadvantage and, if they were to prevail on their ADEA challenge to the Dome Light Regulation, that injury would be redressed. As previously noted, whether plaintiffs will prevail does not bear on their standing to bring a claim. Accordingly, just as with the ADA count, plaintiffs have adequately alleged the elements of Article III standing.

### 2. Failure to State a Claim

The ADEA count will, however, be dismissed for failure to state a claim. First, neither the District itself nor the Taxicab Commission qualifies as plaintiffs' "employer" under the ADEA. *See, e.g.*, *Bonaby v. New York City Taxi & Limousine Comm'n.*, No. 02-cv-5423, 2003 WL 21649453, at *4 (S.D.N.Y. July 14, 2003) ("The plain meaning and statutory definitions of "employer" . . . in . . . the ADEA indicate that those terms are not intended to apply to the type of licensing activity in which the New York City Taxi & Limousine Commission engages.") Second, the allegation that the Dome Light Regulation "places an undue burden" on drivers over the age of 40 without any indication of what that burden is or how it is linked to the drivers' age fails to provide sufficient "factual content" to "allow the court to draw the reasonable inference"

that the Dome Light Regulation violates the ADEA. *See Iqbal* at 556. Finally, the complaint does not allege that the taxicab drivers' age was the "but-for" cause of the decision to enact the Dome Light Regulation. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) ("To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the "but-for" cause of the employer's adverse decision.") Accordingly, plaintiffs' have failed to plausibly allege that the Dome Light Regulation violates the ADEA.

## II. CONSTITUTIONAL CLAIMS AGAINST THE DISTRICT

### A. Equal Protection (Count III)

Count III challenges the MTS Regulation on equal protection grounds. It alleges that under the MTS Regulation (and related rules), licensed taxicab drivers are subjected to "draconian" requirements that impose greater burdens on them than are imposed on any other individual or business in the District of Columbia. According to the allegations in the complaint: drivers are "required to select a PSP from a limited mandatory list of providers to process credit card transactions"; the agreement between the PSP and the Commission "permits the District full access to all drivers' credit card transactions"; the PSP can "track the movement of taxicab drivers in real time"; after the PSP processes the credit card transactions, it can "pass the trip data to the TCIS, delayed by twenty four hours"; "[t]he Commission has the full authority to mine all information from every taxicab drivers' transaction"; taxicab drivers "are obligated to pay to the Commission twenty five cents ($.25) for every cash or credit card fare"; "[i]f the taxicab driver does not remit the required payment to the Commission within a requisite period of time, the Commission will unilaterally access the taxicab driver's vendor-established and mandated account and deduct the amount due to this agency for the cash transactions from the account maintained for the credit card transactions" and [i]f a taxicab driver does not have sufficient

11

funds in his PSP account, the Commission will remotely automatically turn off the taxicab driver's meter and the driver is precluded from picking up any passengers"; "[t]he twenty five cent ($.25) tax . . . diminishes [the drivers'] income"; and "[t]he Commission's ability to automatically withdraw funds from a taxicab drivers' PSP account provides the Commission with unfettered access to each taxicab driver's credit card transactions with a passenger." (2AC ¶¶ 102-112.) The complaint further alleges that the District "intentionally targeted this group of individuals to treat them differently than similarly situated individuals or groups" and that licensed taxicab drivers in the District constitute a "suspect class" because they are all either "foreign born" or "African American." The District has moved to dismiss this count for failure to state a claim or, in the alternative, for summary judgment.

"The Equal Protection Clause protects against arbitrary and irrational classifications, and against invidious discrimination stemming from prejudice and hostility."[9] *Plyler v. Doe*, 457 U.S. 202, 245 (1982). Accordingly, courts apply "strict scrutiny when the challenged classification jeopardizes the exercise of a fundamental right or categorizes individuals on the basis of an inherently suspect characteristic such as race, alienage or national origin, *see Banner v. United States,* 428 F.3d 303, 307 (D.C. Cir. 2005); *Hunt v. Cromartie,* 526 U.S. 541, 546 (1999), but "if a law neither burdens a fundamental right nor targets a suspect class," it will be upheld "so long as it bears a rational relation to some legitimate end." *Romer v. Evans,* 517 U.S. 620, 631 (1996); *Hettinga v. United States,* 677 F.3d 471, 478 (D.C. Cir. 2012) ("A statutory

---

[9] Although the Fifth Amendment does not contain an equal protection clause, the Supreme Court has held that the Due Process Clause of the Fifth Amendment contains an equal protection component that applies to the District government. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Brandon v. Dist. of Columbia Bd. of Parole*, 823 F.2d 644, 650 (D.C. Cir. 1987). The approach to Fifth Amendment equal protection claims is "precisely the same" as the approach to Fourteenth Amendment equal protection claims. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2 (1975).

classification that 'neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993))); *see also Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (to prevail on an equal protection claim, a plaintiff must prove "that the government has treated it differently from a similarly situated party and that the government's explanation for the differing treatment 'does not satisfy the relevant level of scrutiny'" (quoting *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102–03 (D.C. Cir. 2005)). "Where the government's action or policy is facially neutral, a plaintiff 'must plead and prove that the defendant acted with discriminatory purpose.'" *Iqbal*, 129 S. Ct. at 1948.

Here, plaintiffs' equal protection challenge is premised on the application of the strict scrutiny test. However, strict scrutiny will only be applied to a facially neutral law, if the law "has been applied differently on the basis of race, se*e Yick Wo. v. Hopkins,* 118 U.S. 356, 373–74 (1886), or if it is "in fact, motivated by discriminatory intent and has a racially discriminatory impact." *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977); *City of Mobile v. Bolden*, 446 U.S. 55, 113 (1980) ("a showing of discriminatory purpose is necessary to impose strict scrutiny on facially neutral classifications having a racially discriminatory impact"); *Gomillion v. Lightfoot,* 364 U.S. 339 (1960); *Smith v. Henderson*, No. 13-cv-420, 2013 WL 5592905 (D.D.C. Oct. 10, 2013); *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) ("equal protection attack on . . . facially neutral policy could prevail only if [plaintiffs] . . . [could] prov[e] an intent to discriminate"); *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger

the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.")

The regulations at issue are "facially neutral" and there is *no* suggestion that they have been discriminatorily applied. As for the third path to strict scrutiny, the complaint arguably alleges a racially disparate impact (by alleging that the requirements are unique to the taxicab industry and that the drivers are a "suspect class" because they are all either foreign born or African-American), but it fails to allege any basis upon which to infer a plausible inference of discriminatory intent could be drawn. The sole allegation pertaining to intent is that the regulation "intentionally targets" licensed taxicab drivers. But the same could presumably be alleged as to every regulation enacted by the Taxicab Commission. As the Supreme Court explained in *Iqbal*,

> [P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group.

129 S.Ct. at 1948. Considering the "spare facts and allegations" in the complaint, the Court cannot reasonably infer that defendants were "motivated by discriminatory intent or purpose." *Atherton v. Dist. of Columbia Office of the Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009); *Ekwem v. Fenty*, 666 F. Supp. 2d 71, 78-79 (D.D.C. 2009). Absent an adequate allegation of discriminatory purpose or intent, strict scrutiny is not warranted. As there is no allegation that these regulations lack a rational basis, plaintiffs' equal protection claim cannot succeed. *See, e.g., In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013) ("Given facially neutral policies and no showing of intent to discriminate, the chaplains' equal protection attack on the Navy's

specific policies could succeed only with an argument that the policies lack a rational basis."). Accordingly, the Court will dismiss plaintiffs' equal protection claim against the District.

### B. Fourth Amendment (Count II)

Count II alleges that the MTS Regulation violates the Fourth Amendment right of taxicab drivers and passengers to be protected from "unreasonable searches and seizures."[10] U.S. Const. Am. IV. Specifically, plaintiffs complain that requiring installation of an MTS with a GPS tracking system violates the Fourth Amendment because it "tracks all trips from arrival to the final destination," it "reveals the identity of the passenger who traveled in the taxicab and paid for the fare by a credit or debit card as well as the time and location where the travel was initiated and the disembarkation point," and "[a]ll the information after a credit card transaction is processed is downloaded in real time to the District of Columbia Taxicab Commission." (2AC ¶¶ 94-97.) The District has moved to dismiss this count for failure to state a claim or, in the alternative, for summary judgment.

Plaintiffs' Fourth Amendment claim fails because requiring licensed taxicab drivers in the District to install a MTS with a GPS tracking device does not constitute a Fourth Amendment search. A search within the meaning of the Fourth Amendment occurs when the government trespasses on private property, *United States v. Jones*, 132 S. Ct. 945, 949 (2012), or when it infringes on an individual's "reasonable expectation of privacy." *See Katz v. United States*, 389 U.S. 347, 351 (1967); *Maryland v. Macon*, 472 U.S. 463, 469 (1985); *see also Jones* ("the *Katz* reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test"). Here there has been no trespass and no infringement of a reasonable expectation of privacy.

---

[10] The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Am. IV.

As recently explained by another federal district court, confronted with a Fourth Amendment challenge to similar taxicab requirements, "mandating the installation of [a taximeter system with GPS tracking] and installing the system in compliance with regulations do not constitute a common-law trespass: taxi drivers are aware of the system, the system is installed pursuant to regulations, and the taxicabs in which the system is installed are not truly private vehicles." *See El-Nahal v. Yassky*, No. 13-cv-03690, 2014 WL 333463, at *4 (S.D.N.Y. Jan. 29, 2014). In addition, neither the taxicab drivers nor passengers have a reasonable expectation of privacy in the pick-up and drop-off data collected by the GPS tracking aspect of the MTS. In 1983, the Supreme Court held that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *See United States v. Knotts*, 460 U.S. 276, 281 (1983). Applying *Knotts*, other courts have held, and this Court agrees, that requiring a taxicab driver to install a GPS tracking device that records the start and end of each trip does not infringe on any reasonable expectation of privacy. *See El-Nahal* at *5-*6 (no reasonable expectation of privacy in trip data given long history of regulation of taxicab industry and prior requirement to create "trip sheets" containing the same information); *see also Buliga v. New York City Taxi and Limousine Comm'n*, 2007 WL 4547738, at *2 (S.D.N.Y. 2007) ("well established that there is no Fourth Amendment protection accorded information about the location and movement of cars on public thoroughfares"), *aff'd*, 324 F. App'x 82 (2d Cir. 2009); *Alexandre v. New York City Taxi and Limousine Comm'n*, 2007 WL 2826952, at *9 (S.D.N.Y. Sep. 28, 2007) ("Where, as in the taxicab context presented here, there is likely no legitimate expectation of privacy, there is also no search or seizure within the ambit of the Fourth Amendment.")[11] Absent a Fourth Amendment "search," there can be no Fourth Amendment violation, and plaintiffs' Fourth Amendment count must be dismissed.

---

[11] The holding of *Knotts* as applied to those who drive or hire taxicabs was not undermined by the suggestion in the concurring opinion in *United States v. Jones*, 132 S. Ct. at 958 (Alito, J.

## III. INDIVIDUAL CAPACITY CLAIMS AGAINST LINTON (Counts V, VI, VII)

Counts V, VI, and VII allege that Linton is "individually liable" pursuant 42 U.S.C. 1983 for each of the statutory and constitutional claims against the District. (*See* 2AC ¶¶ 135-138 (constitutional violations); ¶¶ 139-143 (ADA violation); ¶¶ 144- 148 (ADEA violation).) In each instance, the complaint alleges that "Linton, in his capacity as Chairman of the Commission, is responsible for supervising the conduct of commission members in relation to constitutional and other violations that the defendants committed against the plaintiffs" (2AC ¶¶ 136, 140, 145) and for "ensur[ing] that the Commission's policies and regulations do not violate" the law (2AC ¶¶ 141, 146)[12] and that he "failed in his fiduciary duty to his employer, the District of Columbia, to bring to their attention any conduct involving [such] violations by the District of Columbia Taxicab Commission." (2d Am. Compl. ¶¶ 137, 142, 147.)

All of these claims are meritless. First, in each instance Linton's liability depends on the existence of an underlying constitutional or statutory violation, but the Court has determined that all of the claims against the District must be dismissed. Second, there is no individual liability under either Title II of the ADA or the ADEA. *See, e.g.*, *Smith v. Janey*, 664 F. Supp. 2d 1, 8 (D.D.C. 2009)(" no individual liability under . . . the ADEA or the ADA"), *aff'd sub nom. Smith v. Rhee*, No. 09-7100, 2010 WL 1633177 (D.C. Cir. Apr. 6, 2010); *Sindram v. Merriwether*, 506 F. Supp. 2d 7, 11 (D.D.C. 2007) ("Title II of the ADA does not permit lawsuits against individuals."). Accordingly, plaintiffs' claims against Linton will be dismissed.

---

concurring in judgment) and the holding in the Court of Appeals decision in the underlying case, *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), that an individual's reasonable expectation of privacy is infringed by police using a GPS device to continuously track his movements for 28 days. *Id*. at 555-566.

[12] In what appears to be an oversight, Count V does not include this allegation. (2AC ¶¶ 135-38.)

### IV. NEGLIGENT TRAINING CLAIM (Count VIII)

Count VIII of the complaint alleges that the District is liable under 42 U.S.C. § 1983 for "fail[ing] to effectively train, supervise discipline, and control the personnel it employs in the District of Columbia Taxicab Commission" regarding the statutory and constitutional laws that the MTS Regulation and the Dome Light Regulation allegedly violated. Having concluded that the complaint fails to state a claim for any statutory or constitutional violation, this count must also be dismissed.

### V. PRELIMINARY INJUNCTION

Having concluded that plaintiffs' complaint should be dismissed for failure to state a claim, plaintiffs' motion for a preliminary injunction is moot.

### CONCLUSION

For the reasons stated above, the Court will grant defendants' motion to dismiss and deny as moot defendants' motion for summary judgment and plaintiffs' motion for a preliminary injunction. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

DATE: June 2, 2014